**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORHTERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SEAN HEALY,** **Plaintiff** | ) ) ) ) | |
| **v.** | ) | **Case No.** |
| **MODERNE CAPITAL, LLC.,** **Defendant** | ) ) ) | |

## COMPLAINT AT LAW

NOW COMES SEAN HEALY (hereafter "Plaintiff") by and through his attorney, John M. O'Toole of O'Toole Law Firm, LLC., and in his claim against MODERNE CAPITAL, LLC. (hereafter "Defendant" and sometimes referred to as "the company" or "firm") states the following:

## BACKGROUND AND NATURE OF CLAIM

1. On or about May 7, 2019, Plaintiff was an employee of Home Depot in their Charlotte, North Carolina location and worked in the corporate strategies department.

2. Plaintiff had been contacted by Lindsay Hyde, a friend of his from the Harvard Business School, who had asked if he would be interested in a venture capital (hereafter "VC") role. Plaintiff advised Lindsay that he was happy in his current role but that it never hurts to talk.

3. On May 13, 2019, Plaintiff had an initial phone interview with Liza Benson (hereafter "Benson"), a managing partner with the Defendant. Plaintiff later found out through back channels that the interview went very well.

4. On May 22, 2019, Defendant began the recruiting process of Plaintiff in earnest by coordinating a phone interview with Constance Freedman (hereafter "Freedman"), the founder and managing partner with Defendant, and scheduling travel for Plaintiff to Chicago in order to conduct in-person interviews with the Defendant's team.

5. On June 3, 2019, Plaintiff flew to Defendant's location in Chicago and had an in-person interview with the entire team which consisted of Freedman, Liza Benson (partner), Shawn Hill (partner), Michael Baldwin (senior associate), Lindsay Hyde (entrepreneur in residence), Stephanie Koenig (chief of staff), and, Taylor Ramsey (program manager).

6. On June 7, 2019, the Defendant extended an Offer of Employment (hereafter "Offer"), **Exhibit 1H**

7. On June 9, 2019, Plaintiff had personal reservations about giving up my current position at Home Depot and shared these reservations with the firm partners and in particular Liza Benson, **Exhibit 2H.**

8. Plaintiff also had a major concern with having to move on short notice from Charlotte, North Carolina to Chicago and shared these concerns with Freedman, **Exhibit 3H.**

9. On the morning of June 10, 2019, Plaintiff discussed his concerns identified above via a phone conversation with Freedman. In that phone conversation, Plaintiff had reached a verbal agreement with Freedman that Plaintiff's move to Chicago would be postponed until the summer of 2020 and that there was a mutual understanding of the career risk that Plaintiff was assuming by joining Defendant.

10. As a former Army offer and current Army reservist, Plaintiff had informed Freedman that he would occasionally need to take time off for Army Reserve obligations and the nearest one was in December of 2019.

11. Defendant accepted Plaintiff's concerns expressed above and stated in a follow-up text that "I appreciate the openness and candor. I think it shows much and how well we will work together moving forward. Looking forward to having you part of the team!"

12. Prior to joining Defendant, Plaintiff performed "due diligence" on the company by consulting SEC Form D filings and ascertained that the firm had raised $42.7 million in total as of mid-2018.

13. Plaintiff had also learned from Lindsay Hyde, a fellow employee at the company, just what she is being paid as well as the fact that she had collected her bonus.

14. Later that same day or June 10, 2019, Plaintiff accepted and was informed that his start date with Defendant would be June 24, 2019. This start date conformed with Defendant's stated need to have someone in the seat by June 26, 2019 in order to attend a key conference in Denver, Colorado.

15. Plaintiff then provided Home Depot with a 2-weeek notice. His last day at Home Depot was June 21, 2019 - after having been in the corporate strategies' role for just 8 months.

16. On June 24, 2019, Plaintiff did in fact begin his first day with Defendant.

17. From June 24, 2019 until July 12, 2019, Plaintiff participated in various functions with the company, including but not limited to the following:

a. closed out Cohort 1 of the 2019 Passport class. Cohort 1 refers to the 8 companies participating in the Passport Program from January 2019 to July 2019. The Passport Program was a remote based, startup accelerator designed to immerse early stage companies in the residential and multi-family real estate industries over a period of 7 months.

b. the Cohort 2 options were vetted, which means that prospect companies were evaluated on their long-term viability, fit with the passport program's intentions, and likelihood to accept the terms of program admission (which includes payment of marketing fees and forfeiture of equity warrants). Also, a new class of 7 companies was selected to participate in the Passport Program from July 2019 to January 2020.

c. Plaintiff's personal likeness and academic credentials are used in documents for the purpose of fund raising. In addition to having graduated from the United

States Military Academy (West Point), Plaintiff earned his Master's in Business Administration or "MBA" from Harvard.

18. On July 15, 2019, Cohort 2 was finalized. This entailed completing the following: agreeing to terms of enrollment (payment of fees and forfeiture of equity warrants), submitting necessary documentation (including collateral documentation such as company pitch decks, capitalization tables, fundraising status, current financials and future projections).

19. Following the finalization of Cohort 2, the "7-month program began." This program consisted of the following activities:

a. "Kickoff" event that provided companies with background information on the industries they would be exploring.
b. An outline of the Passport Program's structure and schedule of events.
c. An introduction to the Moderne Team, including individual roles and responsibilities.

20. During the July 16, 2019 to August 9, 2019 timeframe, Plaintiff executed the following activities for the company:

a. portfolio company support/consulting;
b. business development;
c. "mentor" recruiting;
d. deal sourcing;
e. diligence; and,
f. negotiation

21. On or about August 5, 2019, Plaintiff met with Freeman for his first one-on-one review. Plaintiff reminded Freedman of his responsibilities as a drilling Army reservist and was told "no problem, I remember you saying that. We'll work around it."

22. From August 12, 2019 to August 19, 2019, the company held its annual Limited Partners (hereafter "LP") summit. Plaintiff's academic and business credentials were publicly broadcasted to an audience of 150+ to support the company's fundraising efforts.

23. from August 28, 2019 to August 31, 2019, the Defendant conducts its first retreat at the Freedman's lake house in Michigan.

24. On September 9, 2019, Freedman returns from a week of vacation with her family and expresses concerns that Plaintiff was not performing key activities, particularly sourcing new companies who can afford the fees associated with being in the Passport Program.

25. On September 17, 2019, Plaintiff was reprimanded for travel expenses incurred in August of 2019 despite having stayed at the some of the most inexpensive hotels and pre-booking air travel as far out as possible.

26. Plaintiff and Defendant both understood and accepted that Plaintiff would need to travel to fulfill his responsibilities and become part of the team as well as to acclimate himself to the culture in Chicago.

27. Plaintiff traveled 14 of the 16 weeks that he was employed.

28. Defendant's notification to Plaintiff that he was "costing too much" came as a complete surprise to Plaintiff insofar as he was fully making himself available to the company as much as possible and was traveling as was expected for him to do.

29. On September 30, 2019, Taylor Ramsey, the administrative manager for the Passport Program departed on maternity leave. As a result, Plaintiff inherited all her administrative tasks in addition to continuing his own activities as the Program Director.

30. From October 1, 2019 to approximately October 10, 2019, Plaintiff picked up yet additional responsibilities from a colleague who was on Paid Time Off (hereafter "PTO") from October 4, 2019 to October 10, 2019.

31. As a result of Plaintiff's job responsibilities, including but not limited, to those identified in paragraphs 6, and, 17-20 *supra,* Plaintiff is now working no less than 80 hours/week.

32. On October 8, 2019, Plaintiff notified Freedman that his grandmother has passed away unexpectantly and would likely have to travel back to Rhode Island (Plaintiff's home state) soon to attend memorial events.

33. On October 10, 2019, Plaintiff was notified in-person for "lack of fit and unexpected costs" and a severance agreement was offered.

## JURISDICTION AND VENUE

34. Plaintiff adopts and incorporates by reference paragraphs 1-33 as stated in **Background and Nature of Claim** and realleges same as paragraph 34.

35. Jurisdiction with the district court is proper because of compliance with 28 U.S.C. § 1332(a)(1) insofar as the matter in controversy exceeds the sum or value of $75,000 and is between citizens of 2 different states – North Carolina (Plaintiff) and Illinois (Defendant).

36. Venue is proper in Illinois under 28 U.S.C. § 1991(a)(1) insofar as Defendant resides in Chicago.

## COUNT I – EQUITABLE ESTOPPEL

37. Plaintiff adopts and incorporates by reference paragraphs 1-36 as stated *supra* and realleges same as paragraph 37.

38. To make a claim for equitable estoppel, according to *Vaughn v. Speaker*, 126 Ill.2d 162 (Ill. 1988), 533 N.E. 2d 885, Plaintiff must plead to the following 6 elements summarized as per the below:

A. words or conduct by the party against whom estoppel is alleged amounting to a misrepresentation or concealment of material facts;
B. party against whom estoppel is alleged must have had knowledge at the time the representations were made that they were untrue;
C. the truth respecting the representations so made must be unknown to the party claiming the benefit at the time of the estoppel;
D. the party estopped must intend or reasonably expect that his conduct or representations will be acted on by the other party asserting the estoppel;
E. the party claiming the benefit of the estoppel must have in good faith relied upon the misrepresentation to his detriment and his reliance must be reasonable; and,
F. the party claiming the benefit of the estoppel must have so acted, because of such representations or conduct and that he would be prejudiced if the other party would be permitted to deny the truth.

***A. Words or conduct amounting to misrepresentation or concealment of material facts:***

39. Turning to element A of paragraph 38, **before joining**, (emphasis supplied), Plaintiff expressed "going concern" issues about the Defendant due to his previous entrepreneurial setbacks and was assured during negotiations by Freedman that "it's not like we're a startup that carries high risk. We've been around for years and will continue to be so. Our Passport Program makes money on the fees we charge to participants and we also compile management fees on the investments we have secured from our limited partners." This statement misrepresented the true, and then current, economic state of the firm which was struggling financially and in need of raising money in order to stay viable. This reality became apparent to Plaintiff almost 3 months after joining when he was notified by the Defendant on September 16, 2019 that the fund's management fees were "tapped out" and that the "Passport Program's finances were the only source of funds available" to provide for the Defendant's salary and travel expenses.

40. Plaintiff learned as well that that the previous Passport Director (Lindsey Hyde)'s annual salary was $130,000/year, "with a 100% bonus paid 2x per year." This would make her total salary compensation, inclusive of bonus, about $390,000/annum ($130,000 x 3). Plaintiff's salary was $155,000/year subject to a $25,000 annual bonus. Based on this information, Plaintiff reasoned that he was stepping aboard a solid organization.

41. Plaintiff attributed the discrepancy in salary with his predecessor's to the difference in in title that he would be assuming (predecessor was titled a "Partner, traveled 20% of her time and rarely visited the Chicago headquarters, whereas, Plaintiff as a "Director" was expected to travel upwards of 80% of the time.)

42. Plaintiff has since learned that Shawn Hill (hereafter "Hill") was promoted to Partner around the same time that Plaintiff took over for Lindsay Hyde and is believed to have received a significant raise. Plaintiff, on information and belief, suspects that Defendant was then not able to pay both Hill and Plaintiff under the new organization structure.

43. Plaintiff learned **after joining** (emphasis supplied) Defendant's company that the only expectation made clear to him was that he would be expected to travel to Chicago as much as possible in order to integrate himself into the team and acclimate himself to the culture. In the Offer letter (**Exhibit 1H**), there were 4 Responsibilities identified for him. Of the 4, **Responsibilities** 2 and 3 were vague and at the concept stage when Plaintiff joined.

44. On information and belief, it is Plaintiff's impression that **Responsibilities** 2 and 3 were afterthoughts in the fund's priority set as the fundraising campaign began to waiver.

45. It was in **Responsibilities** 1 and 4 where Plaintiff spent most of his time and where his experience and acquired knowledge (especially from his home improvement

experiences from Home Depot) was used to counsel several of the portfolio companies in their business development initiative and go to market plans.

46. Plaintiff identified numerous investor targets for the fund and set conditions for those targets to be solicited by Defendant. A short list of those targets would include Bank of America, Home Depot, TIAA, Ally Bank, and, Olympus Partners.

47. Plaintiff repeatedly told Freedman that it was "my goal to prove to you how committed he was to his job and his desire to demonstrate that I'm worth of the investment it will take to move my family here next summer."

48. It was also made explicit to Plaintiff on or about September 16, 2019 that he would be expected to reduce travel costs whenever possible through frugal booking and timely purchasing of airline tickets – which is exactly what Plaintiff did. It was during this same meeting that Plaintiff reminded Freedman about how much he had given up joining the Defendant dating back to June of 2019 and that he was willing to do whatever was necessary to support the Defendant's needs. In response to the same, he was told by Freedman that "we'll make it work."

49. Plaintiff also sought to reduce travel expenses by working from home – he was rebuked for doing so.

50. On one specific occasion, Plaintiff asked to work from home not only to recirculate his network in Charlotte, North Carolina, but also because his son was having invasive surgery. The response that Freedman gave him was "This is what makes the remote piece hard and why the position is slotted to be in Chicago. We need all hands on-deck for next week." Plaintiff did board a plane for Chicago the same day his son had invasive surgery so that he would be available for the team.

51. Another time that Plaintiff tried to work from home was from September 2, 2019 to September 13, 2019. When Plaintiff advised Defendant how much travel costs to and from Chicago were during this time frame, he was told not to book anything.

52. On September 9, 2019, Plaintiff was admonished while working from home and for not attending a conference in Washington D.C. – this conference was being held on behalf of Passport Programs, yet none of the Passport Programs' companies wanted to attend it and the Plaintiff advised Freedman that he didn't think that his attendance was worth the cost of travel since he would be attending by himself and didn't have much time to plan for what would be a sparsely attended event.

53. At this point, Plaintiff was unsure if his traveling and associated costs were deleterious to the firm's financial health or if he, in fact, was expected to travel each week – he was receiving conflicting messages from Freedman.

54. It was only after 2 and ½ months into the job, or on or about September 16, 2019, when Plaintiff found out that only $22,000/annum was earmarked for his travel expense. He had never previously been informed that had such a travel budget and Defendant kept this fact concealed from him.

55. Over the course of approximately 111 days, Plaintiff incurred about $19,669 in travel costs, with approximately $5,537.11 unreimbursed (later substantially paid). After Plaintiff found out that he was on a very limited budget, he cut back on the actual number of days spent in Chicago. For example, to save on lodging costs, Plaintiff flew in and out of Chicago on the same day.

56. Also, during the September 16, 2019 meeting, referenced in paragraph 53, Plaintiff was told, for the first time, that his travel expenses come out of her (Freedman's)

pocket. Previously, Plaintiff was never informed that the exigency of his position was tied directly to the performance of the Passport Program alone and not that of the broader Moderne Ventures fund.

57. It was during this this September 16, 2019 meeting as well that Plaintiff was told by Freedman that if he didn't spend more time sourcing new companies to join Passport, that "I (Freedman) don't know how long I'm going to be able to pay for you."

58. It was only during the week of September 23, 2019 where Plaintiff was told for the first time about how he would be able to earn the $25,000 bonus. This bonus would be earned by the implementation of the "management by objectives" document, **Exhibit 4H**.

59. The gist of the document referred to as **Exhibit 4H** was to source 14 Passport companies (7/class over the course of a year), with each paying approximately $30,000 in marketing fees and each affording $270,000 worth of equity warrants to the company which they did not have to pay for but obtained for services rendered.

60. Referencing paragraph 59 *supra*, there was no reasonable way that Plaintiff would be able to qualify for the bonus given his limitations on travel and associated expenses and confusing and misrepresented **Responsibilities** as expressed in his Offer.

***B. Defendant had knowledge that facts were untrue or made misrepresentations.***

61. Plaintiff was never granted visibility into the financial state of the Passport Program or the firm's financial status outside what was stated *supra*.

62. On information and belief, Freedman is the only person with unlimited access to this financial information and she never shared it with Plaintiff.

63. Furthermore, Freedman would have known how much Plaintiff's expected travel expenses would have been seeing how she directed his trips (**Exhibit 5H**) and would have determined how much she would have to budget to bring on someone with the credentials of Plaintiff.

64. On information and belief, Freedman, as head of the Moderne Ventures, would have known how the budgeting and accounting per unit/organizational department or program would be determined and the amount of profit to be calculated. This information was never communicated to Plaintiff.

65. It was made clear to Plaintiff, prior to joining Defendant, that the company had in fact "soft-circled" $40 to $50 million for the new fund which was looking to raise $150 million. "Soft-circled" in the VC world means that investors had verbally committed to investing in a certain amount in a future fund and that there's a reasonable expectation that said investments will materialize once capital calls are made by the fund's managing director. This "soft circled" amount was a fraudulent statement insofar as Plaintiff would later find out 2 months ***after*** (emphasis supplied) he joined (June 24, 2019) that only $2.5 million had been verbally committed.

66. Fund-raising in the VC world is typically accomplished by using a "tranche" system whereby the first tranche typically consists of those closest to the company and are repeat investors. These investors are the most reliable and oftentimes make up 1/3 of the desired fund total.

67. By having "soft-circled" already about 1/3 of the desired fund total, this was a

positive sign to Plaintiff that more had been committed. This is because in order to close the new fund's first tranche at $50 million, then, there would have been most likely verbal investment commitments approximating $60 million to $70 million.

68. Raising funds for a VC operation, such as Defendant's, is based on momentum. Once the company raised the $50 million of the $150 million capital target in its first tranche, it is then in the position to tell 2d and 3rd order investors of this to induce them to also invest so as not to miss out on acquiring space in the new fund.

69. The "soft-circled" amount was a compelling argument and convinced Plaintiff that he was joining a financially solid company with funding adequate to pay not only his salary and benefits but also other company financial obligations.

70. In truth, the allegedly made "soft-circled" amount of $40 million to $50 million was totally false, and Defendant was nowhere near the fundraising amount represented to Plaintiff during his recruitment process and was not true when Plaintiff joined the company on June 24, 2019.

***C. Truth behind representations were unknown to the party claiming estoppel.***

71. On information and belief, the industry standard management fee is 2.5% on the $43.5 million that the fund was alleged to have raised. Plaintiff, did not, in fact know how much had been raised – only Freedman knew - and believed Freedman when she represented that $40 million to $50 million had been "soft circled."

72. Applying the arithmetic, the new fund would have received approximately $1 million ($43.5 million x .025) in management fees annually to cover its operating expenses for

its 6 total employees. Plaintiff also took into account the former director's stated remuneration which was somewhere between $260,000 ($130,000 x 2) and $390,000 ($130,000 x 3 – bonus of 2/annum plus annual salary) in order to estimate the fund's financial health.

73. Nowhere in the offer letter (**Exhibit 1H**) does it indicate that Plaintiff's fate was tied **exclusively** (emphasis supplied) to the financial performance of the Passport Program on a stand-alone basis.

74. The offer letter of **Exhibit 1H** indicated that Plaintiff would, *inter alia*, be assuming "Fund level responsibilities" with the expectation of becoming an equity interest holder of Modern Associates I.

***D. Moderne Capital (party estopped) must have intended or reasonably expected that their representations would be reasonably acted on.***

75. Plaintiff's June 9, 2019 E-Mails, **Exhibit 2 and Exhibit 3** clearly indicated his interest in the position and outlined his concerns.

76. Following Plaintiff's June 9, 2019 E-Mail (**Exhibit 2)** to Liza Benson, he (Plaintiff) received a text that same day stating, "got your note, will call in about an hour." Plaintiff had an hour-long conversation with Liza Benson between approximately 6:45 and 7:45 p.m. that same evening where she (Liza Benson) acknowledged Plaintiff's concerns and assured Plaintiff that he had nothing to worry about that this move would "open doors for me in the venture space and will prove to be long-lasting."

77. Plaintiff was also told by Liza Benson that in discussing his moving his entire family on short notice that he was told to "negotiate with Constance (Freedman) to make that based on a triggering event like the closing of a new fund – this is exactly what Plaintiff did.

78. On June 9, 2019, on or about 11:33 p.m. Eastern Standard Time ("EST"), Freedman responded to Plaintiff's E-Mail sent that same day with "Sean, I'm glad to hear that you're excited about the position! I'll give you a ring around 8:30 a.m. or 9:00 a.m. central tomorrow morning."

79. Plaintiff did talk with Freedman on June 10, 2019 while Plaintiff was in his office at Home Depot and it was during this discussion that she also provided Plaintiff all the assurances about what a safe bet this job would be and that it would be acceptable for him to table the need to move to Chicago until the summer of 2020 when Plaintiff's sons would be out of school.

80. Had Defendant not intended to or reasonably expected their representations would be reasonably acted on, why make them? Defendant was courting Plaintiff to join their team and at the onset and wanted to showcase Plaintiff's credentials as a West Point and Harvard Business School graduate. There was nothing to indicate that Defendant was not willing to honor its promises or not willing to make full disclosure of important and/or relevant materials facts pertinent to Plaintiff's position and his decision to join the company.

***E. Claiming party must have in good faith relied on the misrepresentations to his detriment***

81. Plaintiff gave up a job in a key position at Home Depot, after having been their only 8 months, involving corporate strategies that did provide him visibility with top management and the opportunity to rise much higher in the organization with all that it entails such as substantial increases in salary and positions of responsibility, equity options, bonuses any other numerous forms of senior management compensation.

82. As mentioned, Plaintiff gave all of what was currently and potentially afforded to him as stated in paragraph 63 *supra*, for a shot at working with Defendant – a total time period of about 4 months.

83. Plaintiff's relative short tenure with Defendant resulted in him losing out on the many benefits and support provided by Home Depot *vis a vis* the Defendant and he suffered both financial and emotional damages.

***F. Party claiming the benefit (Plaintiff) must have so acted and he would be prejudiced if Defendant was permitted to deny the truth***

84. Plaintiff did, in fact, accept the position with Defendant but would not have given up the security and stability of working with an established "blue-chip" company such as Home Depot to assume the risk of being associated with a VC firm unless the representations made to him were true and that no material facts pertinent to his position with the Defendant were concealed – sadly, this was not the case.

85. Plaintiff is now out of work with a wife and 3 children to support. Plaintiff has been prejudiced because he is now not making any money and may carry the stigma of being an employee not entirely loyal to an employer who may jump ship at any opportunity, so long as it

is perceived as better than wheat he now has which makes getting his next job all the much harder.

WHEREFORE, for the reasons stated above, Plaintiff is demanding "reliance damages" in an amount in excess of $75,000 and to be calculated at trial as well as further relief that the Court judges fair and proper.

**COUNT II – FRAUD IN THE INDUCEMENT**

86. Plaintiff adopts and reincorporates by reference paragraphs 1-85 *supra* and realleges same as paragraph 85.

87. To make a claim for fraudulent inducement, according to *Mann v Kemper Co.*, 247 Ill. App.3d 966 (Ill App. Ct. 1992), 618 N.E.2ds 317, Decided 12/30/1992, Plaintiff must plead to the following 5 elements as summarized below:

A. A false statement of material fact.

B. Knowledge or belief of the falsity of the party making it.
C. Intention to induce the other party to act.
D. Action by the other party in reliance on the truth of the statements.
E. Damage to the other party resulting from such reliance

88. Concealment of an existing material fact can also be fraud if accompanied by scienter, deception, and injury. *Perlman v. Time, Inc.,* (1978), 64 1l App.3d 1909, 195, 380 N.E.2d 1040.1044.

89. Plaintiff is hereby alleging concealment accompanied by scienter, deception, and injury.

90. Acts of concealment perpetrated by Defendant include, but are not limited to, the following:

a. Failing to inform Plaintiff of the true financial health of the company both before he signed on as well as during the time he was there as well as the actual amount of accessible and available management fees on hand to pay Plaintiff;

b. Failing to inform Plaintiff what his actual job responsibilities ended up being almost exclusively (Passport Program) as opposed to what was expressly stated to him, i.e. "Fund Level responsibilities." – see **Exhibit 1H** containing the Offer. Also, Plaintiff was not asked to define and manage the Moderne Innovation Consortium (strategic program for the company's Corporate Partners) nor lead and support the Moderne Marketplace and Moderne Solutions efforts despite being set forth in his Offer letter under **Responsibilities,** subparagraphs (2) and (3) respectively.

c. Failing to inform Plaintiff that not being in Chicago was, in fact, a major concern and limitation on him to do his job while previously it was not;

d. Failing to inform Plaintiff just what his annual travel expense allotment was despite being asked to travel extensively (**Exhibit 5H**);

e. Failing to inform Plaintiff that his compensation was tied **only** (emphasis supplied) to the Passport Program, and not to the overall fortunes of the company;

f. Failing to inform Plaintiff at the onset just how the bonus that he was subject to was to be calculated; and,

g. Failing to inform Plaintiff just how he was to be specifically evaluated for compensation and promotion purposes.

91. "Scienter" generally means that a statement that was made was false or made with an intent to deceive.

92. Defendant, and Freedman in particular, were in the position to know the true financial facts of the company and intentionally misrepresented them. As an example, Freedman told Plaintiff that the company had "soft circled" $40 million to $50 million when Plaintiff joined on June 24, 2019 where, in fact, only $2.5 million had been verbally committed a good 2 months ***after*** (emphasis supplied) Plaintiff had joined Defendant..

93. Defendant knew the criteria or metric as to how Plaintiff was to be evaluated but purposely, and with an intent to deceive, chose not to inform Plaintiff of this.

94. Defendant had a duty to reveal material facts to Plaintiff insofar as they would have made a difference to Plaintiff had they been incorporated in their Offer, **Exhibit 1H** – they weren't.

95. Defendant knew, or should have known, that Plaintiff would be relying on the representations made in the Offer of Employment and other communications seeing how Plaintiff signed the Offer, quit his job, and, within approximately 2 weeks began working for the Defendant.

96. Plaintiff knew, or should have known, that the *Carry* section of the Offer letter **(Exhibit 1H)** stating "expected compensation from Carried the Initial Interest allocation available to you shall be $850,000, based on a 3x return on the Fund; the amount will adjust up or down based on the return multiple actually realized" was not realistic and was designed simply to lure Plaintiff in and sign onto the company.

97. Notwithstanding what is stated *supra*, Defendant engaged in a scheme to defraud Plaintiff insofar as Freedman (an employee and owner of Defendant) purposely concealed the actual financial position of the company on the day Plaintiff joined – a fact which requires special knowledge and which only she would know.

98. Defendant's misrepresentation of the company's financial position on June 24, 2019 (day Plaintiff joined) was particularly egregious insofar as declining and/or compromised cash flow would directly and adversely affect the company's ability to pay Plaintiff, and, the company's ability to continue as a going concern. Freedman intentionally misrepresented and deceived Plaintiff by communicating to him, as a present fact, that $40 million to $50 million had been "soft circled" when this was not the case.

99. In addition to the misrepresentation of the financial status of the company on June 24, 2019, Defendant committed a series or pattern of fraudulent and/or concealed material statements as stated in paragraph 90, subparagraphs a-g and reproduced immediately below:

a. Failing to inform Plaintiff of the true financial health of the company both before he signed on as well as during the time he was there as well as the actual amount of accessible and available management fees on hand to pay Plaintiff;

b. Failing to inform Plaintiff what his actual job responsibilities ended up being almost exclusively (Passport Program) as opposed to what was expressly stated to him, i.e. "Fund Level responsibilities." – see **Exhibit 1H** containing the Offer. Also, Plaintiff was not asked to define and manage the Moderne Innovation Consortium (strategic program for the company's Corporate Partners) nor lead and support the Moderne Marketplace and Moderne Solutions efforts despite being set forth in his Offer letter under **Responsibilities,** subparagraphs (2) and (3) respectively.

c. Failing to inform Plaintiff that not being in Chicago was, in fact, a major concern and limitation on him to do his job while previously it was not;

d. Failing to inform Plaintiff just what his annual travel expense allotment was despite being asked to travel extensively (**Exhibit 5H**);

e. Failing to inform Plaintiff that his compensation was tied **only** (emphasis supplied) to the Passport Program, and not to the overall fortunes of the company;

f. Failing to inform Plaintiff at the onset just how the bonus that he was subject to was to be calculated; and,

g. Failing to inform Plaintiff just how he was to be specifically evaluated for compensation and promotion purposes.

100. The damages that Plaintiff suffered include, but are not limited to, unjust termination of his position with Defendant, loss of benefits, and, loss of the opportunity costs incurred by Plaintiff from having forfeited past employment with Home Depot to assume his terminated position with the Defendant and are more fully identified below.

WHEREFORE, for the reasons stated above Plaintiff is seeking the following damages:

A. Remainder of annual salary owed using an annual pay cycle minus total compensated time spent in his role (113 days)- this equates to about $107,014 ($155,000/365 x 252[365-113]).;

B. Annual bonus for having performed all the sourcing, diligence and mentorship tasks associate with sustaining the Passport Program - $25,000;

C. Pro-rated share of annual management fees attributable to new investments secured in Moderne Fund II while employed in his role - $125,000 (estimated as 2.5% management fee ascribed to approximately $30 million in new investments securely spread across a total of 6 employees, i.e. (.025 x $30 million)/6;

D. Adding up A, B, and, C, comes to $257,014.00

**COUNT III – PUNITIVE DAMAGES**

101 Plaintiff adopts and reincorporates by reference paragraphs 1-100 *supra* and realleges same as paragraph 101.

102. To make a claim for punitive damages in Illinois, according to *William M. Franz v. Calaco Development Corporation and Nunzio Casalino,* 352 Ill. App.3d 1129, 818 N.E. 2d 357 (2004), Plaintiff must plead the following:

A. Freedman's conduct was willful or outrageous due to evil motive or reckless indifference to the rights of others.

B. The focus of punitive damages is not on the position of the party wronged, but the position of the party committing the wrong.

103. The basis of Plaintiff's punitive damages is set forth in paragraph 90 of **Count II** and are reproduced here for ease of review:

a. Failing to inform Plaintiff of the true financial health of the company both before he signed on as well as during the time he was there as well as the actual amount of accessible and available management fees on hand to pay Plaintiff;

b. Failing to inform Plaintiff what his actual job responsibilities ended up being almost exclusively (Passport Program) as opposed to what was expressly stated to him, i.e. "Fund Level responsibilities." – see **Exhibit 1H** containing the Offer. Also, Plaintiff was not asked to define and manage the Moderne Innovation Consortium (strategic program for the company's Corporate Partners) nor lead and support the Moderne Marketplace and Moderne

Solutions efforts despite being set forth in his Offer letter under **<u>Responsibilities</u>**, subparagraphs (2) and (3) respectively.

c. Failing to inform Plaintiff that not being in Chicago was, in fact, a major concern and limitation on him to do his job while previously it was not;

d. Failing to inform Plaintiff just what his annual travel expense allotment was despite being asked to travel extensively (**Exhibit 5H**);

e. Failing to inform Plaintiff that his compensation was tied **only** (emphasis supplied) to the Passport Program, and not to the overall fortunes of the company;

f. Failing to inform Plaintiff at the onset just how the bonus that he was subject to was to be calculated; and,

g. Failing to inform Plaintiff just how he was to be specifically evaluated for compensation and promotion purposes.

104. Defendant lured Plaintiff away with false or deceptive promises and an intentionally concealed material facts knowing that Plaintiff would rely on what he was told and what was stated in his offer – examples of outrageous conduct.

105. Defendant abandoned a lucrative, steady, and well-paying job with Home Depot in order to work 80+ hours for Defendant, mostly in Chicago, while leaving his wife and 3 children home and alone in Charlotte, North Carolina – Defendant knew this.

106. Plaintiff has been out of work since October 10, 2019 and this has put an incredible financial strain on his family, jeopardized future job prospects because of his short tenure with Defendant (4 months), and, attached a stigma onto Plaintiff as one who may not remain loyal for an extended period of time to any existing or prospective employer.

WHEREFORE, for the reasons stated above, Plaintiff is seeking damages 7 times of whatever may be the determined are actual and consequential damages from **<u>Count I and Count II</u>.** above and determined at trial.

Respectfully Submitted, /s/ John M. O'Toole
Attorney for Plaintiff

John M. O'Toole
Attorney No. : 6199003
Firm: O'Toole Law Firm, LLC
Address: 150 S. Wacker Drive, Suite 2400, Chicago, IL 60606
Office Phone: (312) 546-5057
Cell Phone: (312)560-8981
FAX: (312)546-5123
E-Mail: john@otoolelaw.net

# Exhibit 1H

**SEAN HEALY, Plaintiff v. MODERNE CAPITAL, LLC.**

***Offer of Employment***

**Case Number: TBD**

**FROM:**

John M. O'Toole, #: 6199003
O'TOOLE LAW FIRM, LLC
150 S. Wacker Drive, Suite 2400, Chicago, IL. 60606
Work Phone: (312)546-5057
Cell Phone: (312)560-8981
FAX: (312)546-5123
E-Mail: john@otoolelaw.net

MODERNE VENTURES

June 7, 2019

Dear Sean:

Moderne Capital, LLC (the "Firm") is pleased to offer you employment as a Director of the Moderne Ventures Passport effective June 24, 2019 (the "Start Date") based on the terms herein. This position will be located in Chicago, IL.

During the period of your employment, you must devote your entire working time to performing work for or at the direction of the Firm or its affiliates and use your best efforts to complete all assignments. You must also act at all times with the highest ethical standards and with due regard for our clients, customer and business partners and the trust they place in the Firm and our employees.

The following list sets forth certain of the key terms on which you will be employed by the Firm. Please note that this list is not exhaustive, nor is it unchangeable (except as expressly stated below); it merely addresses certain of the terms on which you are being offered employment at this time.

**Responsibilities**

Your duties shall primarily include (but are not limited to):

(1) Supporting and managing the activities associated with the operations of the Moderne Passport Program including Passport event procurement and management, mentor development and sourcing, advising and supporting the portfolio companies within it and the Fund;
(2) Helping to define and manage the Moderne Innovation Consortium, our strategic program for our Corporate Partners
(3) Leading and supporting the Moderne Marketplace and Moderne Solutions effort – a distribution channel intended to help our companies reach the industry more effectively. Responsibilities shall include identifying industry challenges, defining industry solutions, and driving efforts to bring like companies together to meet market demands
(4) Additional Fund level responsibilities shall include sourcing new Passport companies and deals for the Fund; assisting the Firm in advising and managing associated assets in both the Fund and the Passport; and assisting in raising new capital and bringing new clients to the Firm's investment business. In addition, you agree to perform such additional tasks or other duties consistent with your position as may be directed from time to time.

MODERNE VENTURES

**Compensation**

During the time that you are employed by the Firm, you will be eligible for the following compensation:

***Base Salary.*** You will be paid a "Base Salary"-less all applicable withholdings and deductions, and paid in accordance with the Firm's regular payroll practices.

The amount of your Base Salary shall initially computed at an annual rate of $155,000.

The Base Salary may be further adjusted up from time to time in the Firm's sole discretion, which may take into account such factors as the size and type of investment funds under the Firm's management, its performance, your performance, and/or other considerations.

***Bonus***

You will be eligible for a performance-based bonus of $25,000 at the end of your first year. We will create mutually agreed upon performance factors for which the bonus compensation is based within the first quarter of your employment with the Firm.

The Bonus may be further adjusted up from time to time in the Firm's sole discretion, which may take into account such factors as the size and type of investment funds under the Firm's management, its performance, your performance, and/or other considerations.

***Moving Stipend***

You will be eligible for a one time moving stipend of up to $10,000 to be administered within a mutually agreed upon time from the signing of this offer letter to help you and your family to relocate to Chicago.

***Carry.***

After one year of employment with the Firm and separate and apart from your employment with the Firm, you will be offered the opportunity to acquire an equity interest in Moderne Associates I, LLC., a Delaware limited liability company that serves as the "General Partner" of the Fund. Such equity interest shall include a determined percent (out of a total 100 percent) share of the General Partner's "carried interest" in the Fund (the "Carried Interest"). Any grant of Carried Interest will be conditioned upon your execution of, and shall be subject to vesting and other terms of, the "Operating Agreement" of the General Partner.

The expected compensation from Carried the initial Carried Interest allocation available to you shall be $850,000, based on a 3x return on the Fund; the amount will adjust up or down based on the return multiple actually realized. The amount of any Carried Interest granted to you may be adjusted

MODERNE VENTURES

from time to time in the Firm's sole discretion, which may take into account such factors as your performance, industry standards, Firm performance, and/or other considerations.

Distributions in respect of your Carried Interest will be made in the manner set forth in the "Operating Agreement" of the General Partner.

**Paid Time Off**

You will be eligible for fifteen (15) days of paid time off ("PTO") during each year of your employment with the Firm. PTO days shall accrue pro-rata on a monthly basis over the course of each year. Any PTO not used in the year in which it is earned will be deemed forfeited and will not roll over to the subsequent year.

**Other Benefits**

You will be eligible to participate in the Firm's healthcare benefit program currently administered by Blue Cross Blue Shield.

**Employment At Will**

Your employment with the Firm is on an *at-will* basis. This means that, although we hope your employment relationship will be long-term, employment is not guaranteed for any period or on any particular terms, and neither this letter nor any communication should be construed as a contract of guaranteed employment for a particular period of time. Either you or the Firm may terminate your employment at any time, with or without cause and with or without prior notice.

**Non-Disparagement.**

You agree, other than with regard to employees in the good faith performance of your duties with the Firm while employed by the Firm, both during and for five (5) years after your employment with the Firm terminates, not to knowingly disparage the Firm or its officers, directors, employees or agents in any manner likely to be harmful to it or them or its or their business, business reputation or personal reputation. The Firm will direct its board and Executive officers of the Firm, other than in the good faith performance of their duties to the Firm or in connection with their fiduciary duties to the Firm and applicable law, both during and for five (5) years after your employment with the Firm terminates, not to knowingly disparage you in any manner likely to be harmful to you or your business reputation or personal reputation. The foregoing shall not be violated by statements which are truthful, complete and made in good faith in response to any question, inquiry or request for information required by legal process or governmental inquiry.

MODERNE VENTURES

**Confidentiality and Restrictive Covenant Agreement**

As an express condition of your hiring and employment with the Firm, and as an express and absolute condition of your eligibility to receive the Carried Interest described herein, you will be required to sign the forthcoming Operating Agreement, defining the terms of Carried Interest, and the At-Will, Confidential Information, Non-Competition, Non-Solicitation and Invention Assignment Agreement (the "Covenant Agreement"), attached hereto, in which you agree to abide by specific confidentiality, non-disclosure, non-competition, non-solicitation, and non-interference and other covenants delineated therein. All of those covenants, individually and collectively, are incorporated into the Firm's offer of employment to you, as your offer of employment expressly is conditioned upon your agreement to and execution of the Covenant Agreement and Operating Agreement. You understand and agree that your acceptance of and agreement to be bound by such covenants are and shall be express terms of your employment, and that you will not be employed by the Firm absent your agreement and commitment to abide by those covenants. The terms and conditions of the Firm's Covenant Agreement and Operating Agreement which you are to sign in connection with your employment shall be unchangeable, unless set forth in a separate writing signed by the Managing Partner of the Firm.

Please understand that, if your employment terminates, for whatever reason, your obligations under the Operating Agreement and Covenant Agreement (and/or any confidentiality, non-disclosure, non-competition, non-solicitation, and non-interference agreements with the Firm) will continue in full force and effect in accordance with the terms specified therein.

Except for (i) the Covenant Agreement attached hereto, and (ii) the at-will status of your employment, please note that all of the remaining terms stated above may be changed by the Firm, at any time, for any reason, and in its sole discretion.

By signing and accepting this offer letter, you expressly represent and warrant to the Firm that (i) your acceptance of this offer will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which you are a party or by which you are bound; and (ii) you are not a party to or bound by any employment agreement, non-solicitation agreement, non-competition agreement, confidentiality agreement or any other restrictive covenant or agreement with any other person or entity which has been or will be violated by you or by the Firm's conduct of its business as currently conducted and as proposed to be conducted. You confirm that you understand and agree that as a condition of your employment you will be required to enter into the Operating Agreement forthcoming and the Covenant Agreement hereto attached. You further acknowledge and agree that the Firm's offer of employment to you is based solely and exclusively on your generalized skill and knowledge, and that the Firm expressly prohibits you from possessing, relying upon or otherwise using any confidential information or property of any other person or entity in

MODERNE VENTURES

connection with your employment with the Firm, and you represent and warrant that you shall not do so.

To indicate your acceptance of the Firm's offer, please sign and date this letter in the space provided below. The Firm has the right to revoke this offer if not accepted by June 10, 2019 and pending feedback from your references. This letter, together with the Firm's contemporaneous *At-Will, Confidential Information, Non-Competition, Non-Solicitation and Invention Assignment Agreement*, supersedes any prior representations or agreements, whether written or oral, relating to your employment with the Firm. This letter may not be modified or amended except by a written agreement.

I am beyond thrilled to offer you an opportunity to join us and truly believe that you can make a meaningful contribution and impact to the success of the firm that we continue to build together.

Sincerely,

By:____________________________

Name: Constance Freedman

Title: Managing Partner

Moderne Capital, LLC

**Acknowledged and Agreed:**

I hereby acknowledge that I have read and understand the terms stated above, that I have had ample opportunity to consider the terms, and that, by my signature below, I voluntarily agree to and accept the terms as stated:

By: ____________________________

Print: ____Sean A. Healy______________

Dated: ___10 June 2019________

# Exhibit 2H

## SEAN HEALY, Plaintiff v. MODERNE CAPITAL, LLC.

***Career Concerns***

**Case Number: TBD**

**FROM:**

John M. O'Toole, #: 6199003
O'TOOLE LAW FIRM, LLC
150 S. Wacker Drive, Suite 2400, Chicago, IL. 60606
Work Phone: (312)546-5057
Cell Phone: (312)560-8981
FAX: (312)546-5123
E-Mail: john@otoolelaw.net

**John O'Toole**

**From:** Sean Healy <swa.healy44@gmail.com> on behalf of Sean Healy
**Sent:** Sunday, January 19, 2020 6:00 PM
**To:** John O'Toole
**Subject:** Fwd: Would love your take on this

for exhibit 2 - original date sent was on june 9
---------- Forwarded message ---------
From: **Sean Healy** <swa.healy44@gmail.com>
Date: Sat, Dec 28, 2019 at 9:36 AM
Subject: Fwd: Would love your take on this
To: John O'Toole <john@otoolelaw.net>

here's the thread on the email sent to Liza.

---------- Forwarded message ---------
From: **Sean Healy** <swa.healy44@gmail.com>
Date: Sun, Jun 9, 2019 at 4:08 PM
Subject: Would love your take on this
To: Liza Benson <liza@moderneventures.com>

Hi Liza,

Would love to get your take on the response I've put together below for Constance. While I know there's a benefit to just talking on the phone to address my concerns, I wanted to outline them in writing first so she could have a chance to absorb what's on my mind before we proceed on any potential agreement. I'm certainly happy to chat with her more broadly about everything outlined therein, but knowing that you're in an informed position to speak to her frame of mind, I wanted to pass this by you first before I send it off to her. Mind giving it a look and potentially following up with a call later today if you can spare the time? I"ll be practicing baseball with my boys here shortly, but am available later this afternoon/evening if that would work for you. Thanks so much in advance for your time,

Sean

Constance,

Obviously, I've been thinking a lot about the prospect of joining the team these past few days. To say that I'm humbled by the offer you've extended would be an understatement. The thought of doing something that really excites me and getting compensated for it sounds like an absolute dream. In the absence of other considerations, I'd be inclined to absolutely jump on this opportunity without second thought.

The clause to have to relocate at a mutually agreed upon time does present a slight hiccup for me however because I admittedly don't have any connections to Chicago, nor does my family (at least not yet). Being mindful of how my personal and professional decisions are prone to impact the welfare of my family over the long-term, I'm hesitant to rush into something that carries the potential to impact the relationships that matter most to me a major way.

From your standpoint, the expectation that I move certainly makes a ton of sense. You've got a small, close knit team the culture of which is largely defined by having a centralized location. Integrating new members into the fold of that culture should necessitate that they buy into whatever conditions are required of them to sustain it, proximity among

them. In the absence of making that sacrifice, it's easy to question whether or not someone is truly "bought in" to the larger cause.

While I don't want to speculate on this issue too much, I imagine that Lindsay's recent decision to depart further amplified your concerns on this topic since the chance you took on her contributing remotely didn't pan out the way you probably would've wanted it to. Applied to my candidacy, it's easy to see how a reluctance to move on my part could be construed as being half-way in and half-way out. I "get that," and please believe me when I say that I'm both deeply respectful and appreciative of your concerns on that front. I know that I'd be feeling the same way if I were in your shoes.

On the flip side however is my personal context and that's where I'd like to politely ask you to divert with me for a moment to assess the situation from my standpoint. Whether it's true or not, the book on me reads as if I'm a serial free-agent – an incorrigible entrepreneur who's perpetually distracted by "bright-shiny object" syndrome. While some may look at my past forays into entrepreneurship as admirable acts of courage, the majority of the white-collar world views me as if I'm a rogue agent – someone who's easily distracted, incapable of being trusted, and unlikely to stick anywhere for the long-term.

Being acutely aware of that widely held perception of me, I realize the full gravity that this decision holds for my career because moving back into the entrepreneurial fold now would essentially confirm all those concerns that more established organizations have about me. ***Choosing to join Moderne at this point in time would thus effectively burn the bridge for me to access more traditional opportunities in the future.*** In that sense, my choosing to accept the gracious offer you've extended me would mean that I'm fully bought into the cause whether I elect to move or not.

Given that background, I'd respectfully ask that you weigh the factor of what this choice means to me just as much, if not more, than my willingness to move because a conscious decision on my part to join your team would effectively mean that there's no turning back for me. I'd have to make this work no matter what because there'd be no other recourse for me to take later on. Of course, I think could I further cement the bond between us by bringing new investors into the fold and activating my network to support Moderne's interests, but those efforts might be for naught if the need to relocate within a prescribed timeframe would be a non-negotiable from your standpoint.

Summarizing all this up, I'd say that I'm not entirely opposed to moving at some point, but that I'm also reluctant to agree to do so without knowing that I couldn't do my job without making that concession. While Charlotte is admittedly not to my liking personally, my family has come to call it home for the time being and it would take an awful lot for me to convince them that we all need to uproot ourselves to pursue greener pastures elsewhere. Separating that decision (whether or not to move) from the meaning it carries in your view (an indication of my commitment to Moderne) is ultimately where we need to get on the same page.

As I attempted to outline above, my view is that a choice to join Moderne now constitutes an irreversible commitment on my part to the firm due to the clear implications it carries for my career. I believe that demonstration of commitment is separate and distinct from the meaning that having to move would carry. ***If you agree with me in that assessment, then I'm inclined to gratefully accept your offer and submit my two-week notice to Home Depot as early as tomorrow.*** But if you don't feel that I can perform the role without being in Chicago within a foreseeable time frame, then it's probably more prudent for you to choose a different candidate since I can't in good-conscience make that promise to you now in the absence of having my family's full support to do so.

If we are able to come to an agreement on this particular issue, then I have no doubt that we can come up with a plan to mitigate the risks that our impending distance might incur. But if we aren't, then I genuinely wish to extend you my sincerest thanks for the courtesy you've already shown me and strongly encourage you to consider me as a trustworthy friend of the firm moving forward.

I look forward to hearing back from you on this issue whenever you have a moment and encourage you to take whatever time you need to come to the best conclusion not only for yourself, but also for the rest of the Moderne family. Let me know if I can be helpful to you in any way as you proceed through this deliberation process and I'll happily make myself available.

Thanks again for everything you've already done for me and don't hesitate to reach out should you ever think I can be helpful to you in the future.

Hopefully we can make this work though,

Sean

# Exhibit 3H

## SEAN HEALY, Plaintiff v. MODERNE CAPITAL, LLC.

***Relocation Concerns***

**Case Number: TBD**

**FROM:**

John M. O'Toole, #: 6199003
O'TOOLE LAW FIRM, LLC
150 S. Wacker Drive, Suite 2400, Chicago, IL. 60606
Work Phone: (312)546-5057
Cell Phone: (312)560-8981
FAX: (312)546-5123
E-Mail: john@otoolelaw.net

Constance,

Obviously, I've been thinking a lot about the prospect of joining the team these past few days. To say that I'm humbled by the offer you've extended would be an understatement. The thought of doing something I love while getting paid for it sounds like an absolute dream. I'm not only ready to sign, but am anxious to do so.

Before cementing my commitment however, I'd like to shift the terms of my relocation to Chicago from time based demands to conditions based criteria - conditions based criteria meaning the realization of certain fundraising thresholds and/or other demonstrations of professional security. As I've intimated before, my wife and I are both ready and willing to move. We just feel like we've got one round left in the chamber when it comes to that decision and we want to make sure that we're aimed at the right target before we shoot.

I'm absolutely confident that you and I can come to a mutually desirable place when it comes to this issue. I'd like to better formalize what that looks like in the offer sheet before I sign though. Would you mind setting aside some time for me in the am to discuss this further? I've got a long drive to Atlanta tomorrow morning and there's no one else I'd rather talk to during that span than you.

Thanks again for everything you've done for me thus far. I'm looking forward to making this just the start of our time together.

# Exhibit 4H

## SEAN HEALY, Plaintiff v. MODERNE CAPITAL, LLC.

***Management By Objectives***

**Case Number: TBD**

**FROM:**

John M. O'Toole, #: 6199003
O'TOOLE LAW FIRM, LLC
150 S. Wacker Drive, Suite 2400, Chicago, IL. 60606
Work Phone: (312)546-5057
Cell Phone: (312)560-8981
FAX: (312)546-5123
E-Mail: john@otoolelaw.net

**Passport Roadmap**
**Roles and responsibilities include (but are not limited to)**

| Milestones | Description | |
|---|---|---|
| Recruit Passport Class of 5-10 companies | Participate in the sourcing, interviews, and recruitment of the Passport Class. This will include:<br>• Working with the Moderne network to identify potential companies<br>• Participating in company interviews<br>• [illegible] | |
| Define Success for each Passport Company | Work with 5-10 Passport Companies to establish written KPI's and other metrics that will define success for the company in the real estate industry and in the Passport program. | |
| Define Target Customer Segmentation | Work with 5-10 Passport Companies to create a written document outlining who they are you targeting as customers and the attributes of their ideal customer. | |
| Develop a clearly defined value proposition for the industry | Work with 5-10 Passport Companies to create a written document outlining:<br>1. The problems they solve for each constituent in the industry?<br>2. How are you solving it?<br>3. Why does it matters to the industry? The specific ROI the industry will receive. | |
| Create company overview collateral specific to the industry | Work with 5-10 Portfolio Companies to create collateral specific to the industry and the tracks that they are pursuing.<br><br>At a minimum collateral should include:<br>1. Company tagline<br>2. Company description: slightly longer 1-3 sentences (shorter the better)<br>3. Company Overviews: 3-5 minute overview presentations (ppt) for on-stage presentations<br>4. Landing Page(s) for website (see below)<br>5. Other brochures and handouts | |
| Define industry specific Offering(s) for the vertical | Work with 5-10 Passport Companies to define and document a vertical specific offering relevant for each constituent they are targeting (the offers may all be the same but consider how each of the following will use your product/service- agent, consumer, broker, enterprise, property manager, lender, etc across Real, Multifamily, Office, Insurance, Mortgage, Home Services)<br><br>Pricing should be consistent | |
| Landing page(s). | Work with 5-10 Passport Companies to create landing page(s) that reflect the positioning statements and clearly address defined customer segments. Relevant landing pages on your company's domain are vital to converting visitors into customers. | |
| Develop go-to-market strategy | Work with 5-10 Portfolio companies to create a written go to market strategy that includes:<br>1. Measurable value your company can provide your customers<br>2. Collateral that speaks to your core targets, product offering and call to action<br>3. Target customers | |
| Define Pilot Offering for the vertical | Work with 5-10 Passport companies to define a pilot offering for their select vertical. Moderne pilots are for companies to to provide a low or no cost opportunity for corporates and executives within the Moderne Network to experience your product/service and see its value. | |
| Build Case Studies | Work with 5-10 Portfolio companies to create a case study for prospective clients.<br><br>Help them to identify a showcase client and include:<br>1. What problem your company is solving and for who<br>2. How the company solves that problem<br>3. The ROI achieved through that solution<br>4. How a prospect signs up to have their problem solved. | |
| Portfolio Company Calls | Host twice monthly calls with Portfolio Companies to review progress, address roadblocks, and make forward progress on program. | |
| Leverage Events | In partnership with the Program Manager, engage Mentors to meet with Passport Companies at multifamily residential events and prepare companies to present on stage at events. | |
| Define measurable goals and metrics | Work with 5-10 Portfolio Companies to create written goals and metric for the Passport Program and to track against these metrics on a regular basis throughout the program period, inclusive of:<br>• BD meetings initiated & converted<br>• Pilot program sign-ups & results<br>• Initial company KPIs vs. current | |

# Exhibit 5H

## SEAN HEALY, Plaintiff v. MODERNE CAPITAL, LLC.

***Directed Travel***

**Case Number: TBD**

**FROM:**

John M. O'Toole, #: 6199003
O'TOOLE LAW FIRM, LLC
150 S. Wacker Drive, Suite 2400, Chicago, IL. 60606
Work Phone: (312)546-5057
Cell Phone: (312)560-8981
FAX: (312)546-5123
E-Mail: john@otoolelaw.net

Hey Sean

Here is what we are thinking for your schedule for next couple weeks and events we would like you to be at – happy to talk through. It should be some great trips. Hopefully you meant what you said about being cool w travel it's not always this crazy, but want to get you ramped up and participating at early events as much as possible to start off. Please let me know if you have any conflicts

**Week of June 24**

- June 25-27 Denver (for NAA)
- June 27 evening – June 28 afternoon – Newark (for June 28am meeting) (for Realogy Strategy Session w CEO of NRT, CEO of Realogy Franchise Group, CEO of ERA, SVP of Technology, Realogy and some others)

**Week of July 1**

- July 1 – July 3 Chicago – note office closes at 1p on July 3;
- July 4 – **holiday – BBQ and drink beer with your family**
- July 5 - work from Charlotte day

**Week of July 8**

- Chicago, no events (that we know of right now)

**Week of July 15**

- Chicago **(Passport Kickoff – July 15-17 or July 16-18 )**

**Week of July 23**

- July 22- July 23 Washington DC; **Avalon Bay Investor Pitch at 11a on July 23.** We assume we will get investor meetings in DC on July 22 as well
- July 23 (afternoon) to July 26 Las Vegas; **Inman conference**

**Week of July 29**

- Chicago (note, CF OOO but all others here)

**Week of August 5**

- Chicago

**Week of August 12**

- Chicago **LP & INDUSTRY SUMMIT!!! August 12-15**

**Week of August 19**

- Chicago, no events (that we know of right now)

**As rule of thumb please book Southwest whenever possible b/c they have no change fees and our world changes a lot.** I also have some American Airlines certificates that I will pass on for you to use up for Chicago flights

Constance Freedman
Managing Partner
Moderne Ventures
The Wrigley Building
410 N Michigan Ave Suite 740
Chicago, IL 60611
p: 617-308-3191
e: cfreedman@moderneventures.com